Filed 3/18/21  P. v. Bonilla-Rodriguez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C086828 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F04075) |
| v. | |
| JOSE BONILLA-RODRIGUEZ, | |
| Defendant and Appellant. | |

Three men broke into victim T.P.'s house where he lived with his 13-year-old daughter, E.P.  The men closed E.P. in a bathroom, took T.P. to the garage and beat him, stole cash, marijuana, and a firearm, and then drove off in T.P.'s work truck and trailer. A jury found defendant guilty of two counts of first degree robbery and one count of carjacking.  The trial court sentenced defendant to an aggregate term of 11 years in state prison in this case, and to a total aggregate term of 13 years eight months between this case and an unrelated case.  On appeal, defendant asserts:  (1) the trial court erred in

1

admitting evidence of T.P.'s showup identification of defendant shortly after the robbery, and (2) substantial evidence does not support the carjacking conviction because the evidence failed to establish that T.P.'s truck and trailer were taken from his immediate presence.

We have discovered two sentencing errors, one involving the failure to impose one-third the midterm on count two (first degree robbery), which was to run consecutive to count one (first degree robbery), as required by section 1170.1, subdivision (a), the other related to count three (carjacking) for which the court stayed the sentence pursuant to Penal Code section 654 without imposing a specific sentence to be stayed.[1] We correct the judgment and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with first degree robbery of T.P. (§ 211; count one), first degree robbery of E.P. (§ 211; count two), and carjacking of T.P.'s vehicle (§ 215, subd. (a); count three).[2] As to counts one and two, the People further alleged that defendant acted in concert with his codefendants. (§ 213, subd. (a)(1)(A).) Personal use of a firearm (§ 12022.53, subdivision (b)), and on-bail enhancements (§ 12022.1) were attached to each count.

### Prosecution's Evidence

T.P., a self-employed landscaper, lived with his 13-year-old daughter, E.P. T.P. acknowledged he had "a couple marijuana plants" growing in his backyard.

At approximately 2:00 a.m. on July 7, 2015, T.P. woke up when he heard the window break in E.P.'s bedroom. E.P screamed, and T.P. went to her. T.P. and E.P. then

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

[2] Codefendants William Wainiqolo and Jose Zamora were also charged in the amended felony complaint deemed an information. They are not parties to this appeal.

2

walked down the hallway together and they saw two masked men with handguns in the hallway coming into the kitchen from the garage.

According to T.P., the men wore masks, one of which was a ski mask which covered the individual's head and mouth but not the eyes or nose. The other mask was "more of a fuller mask that . . . covered the ears and the -- most of you could see was the eyes and the nose." Then T.P. saw a third person with a rifle entering through the front door.[3] His face was also covered with a mask.[4] Of all three men, T.P. testified that he could not see their whole faces, but he could see their eyes. The men were all approximately five feet ten inches, but one of them had a bigger build. The two smaller men weighed between 170 and 185 pounds, and the larger man weighed approximately 220 to 230 pounds. All three men wore "like plastic gloves" of the kind one would see at a doctor's office. T.P. testified that two of the three were Hispanic. T.P. was able to make observations about the men's hair, eyes, eyebrows, noses, parts of their mouths, and their bodies. When asked why he did not tell responding police about the race of the men or their hair, T.P. testified that he had been traumatized and dazed at the time.

E.P. testified she tried to avoid looking at the men and avoided eye contact. She could not describe the men at trial beyond testifying that one of them wore a skull mask and another was wearing a ski mask.

One of the men directed T.P. to put his hands out, and then they bound his wrists with a zip tie. They were pointing their guns at him the whole time. Initially, the men had T.P. and E.P. sit on a couch. One of them asked T.P. where the crystal was, which

---

[3] E.P. testified that this third man had a hammer. She did not see that man with a gun.

[4] T.P. acknowledged that, when he spoke with police following the incident, he told them that the third man wore a hoodie that was tied tightly around his face. At trial, T.P. was not sure whether the third man wore a mask or a hoodie obscuring his face. In any case, not much of the man's face was showing.

T.P. understood to mean methamphetamine. T.P. told the men he did not know what they were talking about. He volunteered he had some marijuana and pointed to the spare bedroom where he had some plants drying.

One of the men directed the other two to take T.P. to the garage, separating him from E.P., and T.P. became agitated and frightened for his daughter's safety. The bigger man and one of the other two men began to take T.P. to the garage, and T.P. resisted. T.P. was telling the men not to hurt his daughter. Once he was in the garage, T.P. could no longer see E.P. and he did not know where the other man was keeping her or what he was doing to her. Back in the house, E.P. was placed in the bathroom with the door shut.

In the garage, T.P. started making noise and the men "came at [him] and started working [him] over a little bit to quiet [him] down." They punched him "a few times" in the head. One of the men hit T.P. with either a pry bar or hammer. T.P. became dazed. The two men stayed with T.P. in the garage the whole time. One of the men told T.P. to place a blanket over himself, and T.P. complied. However, sometimes T.P. was able to move so as to see without the blanket obstructing his view. When T.P. made a commotion because he was anxious about his daughter, the men told him to "Shut the fuck up," and one of the men threatened to kill him.

In addition to asking for methamphetamine, the men asked for money, and T.P. said he did not have any. However, T.P. did have $800 hidden between his mattress and box spring, specifically one $100 bill and the rest in $20 bills. One of the men asked him what he had in the trailer attached to his truck, and T.P. responded that he had his landscaping equipment in it. T.P. told the man that the keys were "right there in the kitchen."

T.P. testified that his son's gun had been stored under T.P.'s bed. At one point, T.P. saw that one of the men had that gun in his waistband.

T.P. estimated the time he was detained in the garage to have been between six and ten minutes. Eventually, the men moved T.P. out of the garage and into the

4

bathroom with E.P. T.P. heard doors close, waited a bit, and then called 911 within a minute of the men leaving.[5] E.P. helped T.P. get the zip ties off. T.P. then went outside and saw that one of his trucks and the attached trailer were missing. He provided the 911 operator with information about his missing pickup truck. He also went through his house to see what else was missing. In the spare bedroom, he discovered that the marijuana was gone. In his bedroom, he discovered that his son's gun, a TEC-9, was missing.[6] Also missing were T.P.'s money that had been hidden between his mattress and box spring and his iPhone. Marijuana plants growing in T.P's backyard were also missing. E.P. testified that a $100 bill was missing from her room.

Sacramento Police Officer Mark Roddy responded to T.P.'s house, arriving at 2:56 a.m., and took a statement from T.P. T.P. told Roddy that the men were approximately 5 feet 10 inches to six feet tall, that two of them weighed approximately 180 to 185 pounds, and the third weighed approximately 220 pounds. T.P. described two of the men as wearing ski masks and the third as wearing a hoodie with the hood tied tightly so that only his eyes, nose, and "just part of his face" were visible. T.P. told Roddy that all the men wore gloves, two of the men were armed with handguns, and the third had an AK-47 type of rifle. T.P. also told Roddy he might recognize the men if he saw them again. T.P. testified that he "had a good feeling" that he would be able to recognize the men if he ever saw them again.

At approximately 3:00 a.m., a California Highway Patrol (CHP) helicopter unit spotted T.P.'s truck and trailer. CHP apprised Sacramento Police dispatch, and officers proceeded towards the area as directed by the CHP helicopter unit. A sedan was

---

[5] Portions of the 911 call were played for the jury. In the 911 call, T.P. described the perpetrators as three males with "hoods on."

[6] Although T.P. testified he thought the gun was legal, he was given immunity.

5

following the truck and "making the exact same turning maneuvers as the pickup truck and was following in a very close proximity."

Officers in police vehicles spotted the truck. Officer Daniel Paiz and his partner were the first unit to come upon it. Ultimately, the truck pulled over, while the sedan continued driving. After the truck pulled over, two individuals exited and ran. The driver fled across several lawns and jumped over fences, and the pursuing officer lost sight of him. Police set up a perimeter in the area. The CHP helicopter unit watched the passenger as he fled. The passenger jumped fences, hid, and walked around behind homes.

Lieutenant Steve Oliveira intercepted the sedan, a black Infiniti. Police detained the driver, who officers at trial identified as codefendant Jose Zamora. Zamora was wearing white shoes with striping. On the front seat of the Infiniti, police discovered a white ski mask with a skull painted on the front in black. The eyes had been cut out. A TEC-9 firearm was found on the floor behind the driver's seat. Officer Roy Hastings found a single $100 bill loose in Zamora's pocket. While Hastings was filling out a form to have the Infiniti towed and impounded, Zamora asked, "Did you guys get everybody?"

In the meantime, the police received continual updates from the CHP helicopter unit, and two subjects were seen within the perimeter. Within 30 to 45 minutes, the driver was apprehended. Paiz identified codefendant William Wainiqolo as the person who had been driving T.P.'s truck. Wainiqolo had $800 in his possession, consisting of one $100 bill and 35 $20 bills.

In the backyard of one nearby house, Officer Paiz located a white T-shirt, a hat, and blue rubber or medical gloves. In another nearby backyard, Paiz discovered a pair of blue latex gloves. In the bed of the truck, Paiz saw approximately 13 pounds of marijuana plants.

Officer Michael Magaletti from his position at the perimeter saw a Hispanic male in blue jeans who was not wearing a shirt but was holding a white T-shirt. Magaletti told

6

the man to stop. The man looked at Magaletti and fled. A couple of minutes later, as Magaletti walked around the area, he saw the same man come over a fence, drop down, and crawl behind a bush. Magaletti alerted Officer John Harshbarger, who had a canine partner, Brig. Harshbarger deployed Brig. The male subject got up and attempted to go over a fence, but Brig "got him by the leg." Despite being bitten, the man did not make any noise. Eventually, Magaletti and Harshbarger managed to handcuff the suspect. Both officers identified defendant at trial as the subject apprehended by Brig. Magaletti searched defendant's pants and found blue latex gloves in one of his pockets.

After the subjects were apprehended, Officer Roddy took T.P. to the location where defendant had been detained for a showup. The location was approximately two to three miles from T.P.'s home. Roddy admonished T.P., telling him that police had detained subjects who may or may not have been involved in the incident. Roddy told T.P. to keep an open mind. Roddy also told T.P. to tell him if he was 100 percent certain, if he was not 100 percent certain, or if he did not know.

Defendant was the first subject they viewed. He was removed from a police car approximately 25 to 30 feet away from T.P.'s location. T.P. identified defendant as one of the men who had been in his house, but he was not 100 percent positive. He believed defendant's eyes looked familiar. Roddy acknowledged that T.P. viewed defendant immediately after passing by T.P.'s stolen truck and trailer.

Roddy then drove to a second location where T.P. viewed Wainiqolo. T.P. identified Wainiqolo, and was 100 percent positive. T.P. said that he was the bigger of the three men who had the AK-type rifle. Roddy acknowledged that T.P. made a remark about Wainiqolo appearing Samoan, and that Roddy told T.P. "that was said over the radio." Roddy testified that T.P. never mentioned anything about anyone being Samoan until after he saw Wainiqolo.

Next, Roddy took T.P. to Zamora's location. Before T.P. viewed Zamora, Roddy had him look inside the black Infiniti. T.P. saw a white ski mask inside the car and

identified it as a mask one of the men had worn. T.P. then viewed Zamora, but he could not identify him.

Roddy was shown a recording of an in-car video recorded while he was taking T.P. to the scene of the showup. After watching and listening to the recording, Roddy acknowledged hearing himself say that police "got two out of the three." Roddy testified he did not know why he said that, and said he would not say that again. Roddy did not convey to T.P. that the subjects were, in fact, the men involved in the incident. Roddy also heard a portion of the recording in which, right before the showup, T.P. said, "those guys will do a lot of time for what they did, huh," and Roddy responded, "I think so." Roddy acknowledged that he essentially told T.P. that police "got two out of the three guys," and that they were going to do a lot of time.

E.P. was also transported to another location for the showups. She was not able to identify any of the subjects. She did, however, recognize a skull mask as the mask worn by one of the intruders.

At trial, T.P. identified defendant as the man in his house who had the rifle. T.P. testified that defendant had been wearing a mask. T.P. identified Wainiqolo and testified that he had been wearing "more of, like, a wrestler's mask." T.P. testified Wainiqolo "might have been one of them that was in the garage with me." T.P. also testified that he recognized Wainiqolo's hair and his build as the biggest of the three. T.P. identified Zamora and testified "he was exposed more than the other two," and he "was closer up to me, too." Zamora was the one who directed the other two to take T.P. to the garage. In her trial testimony, E.P. stated that she did not recognize anyone in court from the night of the incident.

On cross-examination by defendant's attorney, T.P. acknowledged that while he was now identifying defendant as the man with the rifle, in the recording of the showup, he identified Wainiqolo as the man with the AK-47. T.P. stated that, at the time of the

8

showup, he was "pretty dazed." But later in his testimony, T.P. acknowledged he did not remember exactly which man held which gun during the incident.

On cross-examination by Wainiqolo's attorney, T.P. testified that, during the incident, to an extent, he was trying to keep his head down. However, he also testified that it is "kind of hard to not look at them when they're punching you." He did not recall telling police that he tried not to look at the perpetrators.

Nikki Sewell testified as a DNA expert. Addressing two cuttings taken from a ski mask, Sewell testified she found a DNA mixture with four contributors, with Zamora as a possible contributor. In two samples taken from a white T-shirt, Sewell found a mixture of four contributors.[7] Defendant was a possible contributor.

**Defense Evidence**

Dr. Geoffrey Loftus, an experimental psychologist, testified as an expert in identification procedures, memory, and how human perception and memory work. Loftus testified that, in addition to the actual "conscious-experience" perceptions that contribute to making a memory of any given event, "post-event information" constitutes "a second root [*sic*] by which people get information into their memory for the event . . . ." According to Loftus, "post-event information fills the holes, plugs the gaps; generally speaking, makes for a better story in their memory of what happened." Post-event information may be true or false. The witness generally will not distinguish between parts of the memory that were derived from conscious-experience information and the parts that were derived from post-event information. Thus, according to Loftus, "people can wind up with a memory that is made up largely of post-event information

---

[7] It appears that the ski mask was the one found in the Infiniti, although this is not clearly established in the record on appeal. Regarding the T-shirt, it appears that this sample was taken from the T-shirt discovered in a backyard near where defendant was apprehended. There is no evidence any other T-shirt was found in this case.

9

and actually very little information that they got as the actual event was taking place." "[U]nder the right circumstances, people are capable of developing a memory that is filled with information that is very strong, very detailed, very real-seeming, a memory that the witness can report with a great deal of confidence, and, yet, a memory that, unbeknownst to the witness, is potentially false in important respects because, unbeknownst to the witness, the memory is based largely on post-event information, whose accuracy is dubious."

Defense counsel gave Loftus a hypothetical reflecting the facts of this case, including the victim originally not being able to provide police with much of a description of the perpetrators and then later identifying a subject at a showup, telling the officer, " 'I told you. He was Samoan,' " and the officer responding that the witness did not previously say that and that the information about a subject being Samoan was broadcast over the radio. Loftus testified that this could be an example of post-event information becoming a part of the witness's memory of the event. Given another hypothetical situation, where a witness cannot give police a description of a suspect, but then, at a showup, identifies a subject and claims to recognize the subject from the eyes, Loftus testified that he would not consider this identification reliable. Loftus also testified that, where a witness is being driven by police to a showup and police tell the witness, " 'We got two out of the three guys,' " this would increase the witness's expectations that the subjects were, in fact, the perpetrators, and would increase the likelihood that the witness would make a positive identification regardless of how good the witness's memory of the event actually was. Additionally, if that witness was driven past his stolen truck and trailer on the way to seeing the first subject nearby in handcuffs, these facts, too, would lead the witness "to the perfectly plausible assumption that the suspects are connected with his stolen vehicle, that they were the people who stole the vehicle and, therefore, were the suspects."

10

## Verdicts and Sentence

The jury found defendant guilty of two counts of first degree robbery (§§ 211, 212.5, subd. (a); counts one and two), found true the enhancement allegations pled in those counts that defendant acted in concert within the meaning of section 213, subdivision (a)(1)(A), and found defendant guilty of carjacking (§ 215, subd. (a); count three). The jury found the personal use of a firearm enhancement allegations to be not true. (§ 12022.53, subd. (b).) Defendant waived jury trial on the on-bail enhancement.

The trial court sentenced defendant to an aggregate term of 11 years on the instant case, calculated as follows: the upper term of nine years on count one, first degree robbery, and the midterm of six years on count two, residential robbery, with all but one-third of the midterm, or two years, stayed.[8] On count three, carjacking, the trial court did not orally impose any particular term from the available triad (§ 215, subd. (b)), and instead only pronounced that the sentence on count three was to be stayed pursuant to section 654.[9] The court imposed and stayed two-year terms on the section 12022.1 on-bail enhancements pending conviction of the primary offense. In addition, the court imposed two years eight months on an unrelated case, for a total aggregate term of 13 years eight months.[10]

---

[8] As we discuss in part III.A. of the Discussion, *post*, this constituted an unauthorized sentence.

[9] This, too, constituted an unauthorized sentence. See part III.B. of the Discussion, *post*.

[10] In a trailing matter, 15F03609 defendant entered a plea of no contest and the trial court sentenced defendant to eight months for violation of Vehicle Code section 2800.2, subdivision (a), the midterm of two years for violation of section 25850, stayed pursuant to section 654, 30 days concurrent for violation of Vehicle Code section 20002, subdivision (a), and 30 days concurrent for violation of section 148, subdivision (a). The court also lifted the stay on the on-bail enhancement. Thus, in the trailing matter, the trial court sentenced defendant to an aggregate term of two years eight months to run consecutively to the instant case. The prosecutor asked to clarify that the on-bail

# DISCUSSION

## I. The Showup Identification of Defendant

### A. Additional Background

#### 1. In Limine Motion

Defendant filed a motion in limine to exclude T.P.'s showup identification of him as impermissibly suggestive. Defendant further asserted that the impermissibly suggestive showup identification would so taint T.P.'s in-court identification of defendant that the in-court identification must also be excluded. Defendant emphasized that the showup was conducted while defendant stood handcuffed in close proximity to T.P.'s stolen truck and trailer and that, prior to the showup, Officer Roddy said to T.P., "I think they got two out of the three." According to defendant, this statement "directly contradicted any admonishment and suggested to [T.P.] that he was going to be looking at two of the three robbers." Defendant noted that T.P. identified the first (defendant) and second (Wainiqolo) subjects shown to him, but did not identify the third individual. According to defendant, this "was consistent with Officer Roddy's suggestion to [T.P.] that police had detained two of the three robbers." Defendant asserted that there was no exigency or other justification for conducting a showup instead of a physical lineup or a six-pack photo lineup.

Defendant further asserted that the identification was not otherwise sufficiently reliable to overcome its suggestiveness. He emphasized that the perpetrators' faces were covered and that T.P. had guns in his face and was being beaten. Defendant asserted that prior to the showup, T.P. was unable to provide Roddy with a description of the perpetrators other than stating they were male, demonstrating that T.P. did not get a good look at the perpetrators. Defendant further asserted that T.P. incorporated details about

---

enhancement "is in regards to Case 15F04075." The trial court agreed that it was. The aggregate term between the two cases was 13 years eight months.

12

the perpetrators he heard over the police radio, further indicating the lack of reliability of his identification.

### 2. Evidence Code Section 402 Hearing

Officer Roddy responded to T.P.'s house in the early morning hours on July 7, 2015, arriving at 2:54 a.m. Roddy testified that T.P. gave a "general description" of the perpetrators. He told Roddy that three males entered his house. They were each approximately 5 feet 10 or six feet tall. Two of them weighed approximately 180 or 185 pounds, while the third weighed approximately 220 pounds. T.P. said two of the men had masks on, and the other had a hoodie tied tightly around his face. One of the masks was a white ski mask with holes for the eyes and nose. According to T.P., portions of all of the men's faces could be seen. T.P. also said that the suspects all had blue gloves on.

Roddy transported T.P. for a showup. Roddy testified that during the ride, he told T.P. that officers had detained either two or three subjects and they needed to see if T.P. could identify them.

Roddy testified that, when he is going to show a victim or a witness a potential subject, he admonishes them by telling them that there are subjects detained, that the subjects may or may not be involved in what occurred, and that, if the victim or witness is not sure, he or she should say they are not sure. "If you don't know -- or if you say no, say no. If it's 100 percent, yes. If you say maybe, maybe." He also would tell witnesses to have an open mind. Roddy testified that he so admonished T.P. Roddy testified that he could be heard on a videotape delivering the end of his admonishment to T.P., although parts of his admonishment were delivered before the audio began to record. The recording displayed a time of 4:18 a.m.

The prosecutor played the video recording during the in limine hearing. In the recording, Roddy could be heard saying, "[i]f you're not sure, you're not sure. But don't say yes just because - -." T.P. reassured Roddy: "I won't, I won't." Later, during the ride, Roddy stated, "I think they got two out of the three." T.P. responded, "Excuse me?"

13

And Roddy repeated, "I think they got two out of the three." Later, T.P. asked, "Those guys will do a lot of time for what they did huh?" Roddy responded, "I think so."

As they approached the location of the showup, T.P. stated, "That's my trailer right there. There's my truck." Roddy testified that the first subject T.P. viewed was defendant. T.P. viewed defendant and stated, "Yeah that was one of them." Asked by Roddy how he knew, T.P. responded, "Because of his face." When Roddy remarked, "I didn't think you saw any of their faces?" T.P. responded, "No but his eyes though, I could see his eyes." Roddy asked about defendant's clothing, and T.P. stated, "He wasn't the one (inaudible) I'm not sure if he's was [*sic*] with the AK 47 or not, but he was one of them." Roddy asked T.P. if he was positive, and he responded that he was "not 100% but see what my daughter says." Roddy confirmed that T.P. was saying "the eyes look the same," and T.P. responded, "His face kind of like yeah, his face." Roddy asked, "So not 100% positive but the eyes and face look familiar," and T.P. responded, "Yeah. Where's the other one?"

When they approached a second subject, Roddy advised T.P., "If there's something distinct, you can tell me. If you don't recognize him at all, say you don't recognize him. Or if there's something on him." The second subject was Wainiqolo. T.P. stated, "Okay. Okay. Yep I could already tell that's that bastard. Yep." Roddy asked what T.P. recognized, and T.P. responded that he recognized the subject's face. Roddy again noted that he "thought all their faces were covered?" and T.P. responded, "the look, the demeanor on his face, you know they don't cover all the way. Yeah I'm 100%, that - - he's the one that had the gun and then said he'd kill me." Roddy asked which gun, and T.P. responded that he was referring to the AK-47. Roddy asked, "[a]nything about the clothes or anything?" and T.P. responded that he was not sure about that. T.P. then said, "remember I said he looked like Samoan. Remember. I said (inaudible)." Roddy responded, "Yeah I got to take that - - I know it was said over the radio. So you didn't say anything about that before, it was said on the radio." T.P.

14

responded, "It kind of was, like I say I was in a daze but that -- he was (inaudible) I'm sure that this was the guy, he was the one that was in charge of it." Roddy cautioned T.P., "you have to remember, if this goes to court you're going to have to say that you're 100%. You need to be honest." T.P. responded, "Yeah I'm trying my best sir. But you know like when you (inaudible) daze like that, like I got you know, like I was worried about my daughter's safety. I was more looking at my daughter." Roddy pointed out that T.P. had indicated he could not see the perpetrators' faces, and yet he was now telling Roddy that he recognized the subjects. T.P. replied, "Well no, no but when they got real close you know, like you know, just like their eyes it was like you know." Roddy confirmed that T.P. was saying that the eyes looked familiar, and then asked about the body size. T.P. stated, "The body size, yeah. And his hair. He was the one he - - he threw a punch at me." T.P. stated that, while he was not 100 percent about the first subject, defendant, "[b]ut this guy right here," Wainiqolo, "this guy I'm 100%."

Officers then took T.P. to a car, inside of which he observed a mask that he recognized as the one worn by "that big guy." Roddy testified that T.P. identified the mask in the Infiniti as the mask worn by Wainiqolo. He was 100 percent certain.

T.P. was later shown a third subject, Zamora, and he stated, "I'm not really sure sir" and "[n]ot 100%," and, when asked if there was anything he might recognize, he responded, "No."

Officer Roddy testified that he never told T.P. that the subjects were, in fact, the people who broke into T.P.'s home. He testified he did not tell T.P. that he needed to identify subjects, that any of the subjects were apprehended driving T.P.'s truck, that one of the subjects was found in a car with a ski mask, that subjects were found with blue gloves, or that the subjects were found with the same denomination of money that was taken from T.P.'s house.

On cross-examination, Roddy acknowledged that, when he was interviewing T.P. at his house prior to the showups, T.P. could not say what race the perpetrators were.

15

T.P. also could not describe the hair of any of the perpetrators, notwithstanding the fact that he stated at the showup that he recognized Wainiqolo's hair. Also, T.P. did not tell Roddy that one of the perpetrators was Samoan. At the house, T.P. was also not able to describe any of the perpetrators' pants or shirts or whether they had tattoos or anything similarly distinctive. Additionally, T.P. told Roddy at one point that, during the incident, he was not trying to look at the perpetrators' faces. T.P. also indicated that, during the ten minutes he was detained in the garage, something was placed over his head so that he could not see.

Roddy acknowledged that, during the showup, defendant was taken out of a police car, he was handcuffed, and he was standing between two police officers. But Roddy also testified that, when T.P. identified Wainiqolo, he did so before Wainiqolo got all the way out of the car.

### 3. Trial Court's Ruling

The trial court denied defendant's motion to exclude T.P.'s showup identification. In doing so, the court considered certain factors. Regarding the accuracy of the witness's description, the court noted the evidence was somewhat limited, "but there was at least height and weight." Regarding the time lapse between the crime and the identification, the court characterized it as "short." The court observed an admonition was given and the officer challenged the witness about his identification. The court also concluded that the fact the witness could not identify Zamora and he was the third out of three, suggested the earlier identification procedures were not unduly suggestive. The court reasoned that because there were three suspects in custody and there were three perpetrators of the crime, if the procedures were unduly suggestive, the witness would have identified Zamora. The court determined that, while there were aspects of the identification that were suggestive, the identification overall was not so unduly suggestive as to give rise to a "substantial likelihood of irreparable mistake in identification."

16

## B. Defendant's Contentions

Defendant asserts that the trial court should have suppressed T.P.'s showup identification of him as unduly suggestive and not otherwise reliable.[11] Defendant asserts that, because the showup identification was unduly suggestive and not otherwise reliable, its admission violated due process. Because T.P.'s identification of defendant was the key piece of evidence supporting his conviction, defendant asserts that the trial court's error in failing to suppress the identification was not harmless, and the judgment must be reversed.

## C. Applicable Principles of Law

" 'A due process violation occurs only if the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." ' [Citations.] 'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.' [Citations.] 'Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' " (*People v. Sanchez* (2019) 7 Cal.5th 14, 35-36 (*Sanchez*).) "Defendant bears the burden of showing unfairness as a demonstrable reality, not just speculation." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.) "A

---

[11] Defendant asserts in his opening brief that police failed to properly admonish T.P. prior to the showups. The People repeatedly disagree, asserting that T.P. received a full admonishment. In his reply brief, defendant acknowledges the People are correct.

17

claim that an identification procedure was unduly suggestive raises a mixed question of law and fact to which we apply a standard of independent review, although we review the determination of historical facts regarding the procedure under a deferential standard." (*People v. Clark* (2016) 63 Cal.4th 522, 556-557; accord *People v. Avila* (2009) 46 Cal.4th 680, 698-699 ["We independently review 'a trial court's ruling that a pretrial identification procedure was not unduly suggestive' "].)

### D. Analysis[12]

#### 1. Suggestiveness

Defendant asserts that the showup was unduly suggestive because, prior to it, T.P. learned that police believed that they had apprehended two of the three intruders, and, when T.P. suggested that the perpetrators would serve a lot of time, Roddy agreed. Defendant asserts that, by the time of the showup, "the seed was already planted in [T.P.'s] mind that [defendant] was one of the perpetrators." Thus, according to defendant, the suggestion by police that they had apprehended a suspect prior to the showup procedure amounts to undue suggestiveness. Defendant further asserts that no exigent circumstances existed that demanded police conduct the showup rather than a six-pack photographic identification procedure.

A little more than an hour after he arrived at T.P.'s house, Officer Roddy transported T.P. to another location two to three miles away for a showup. Prior to the showup, Roddy gave T.P. a full admonishment. (See fn. 11, *ante*.) Roddy testified that

---

**12** Consistent with defendant's argument on appeal, the facts considered in assessing whether T.P.'s pretrial showup identification of defendant was unduly suggestive are derived from Officer Roddy's in limine hearing testimony, portions of the recording of Roddy and T.P. in Roddy's vehicle which was played during the hearing, and Roddy's preliminary hearing testimony, on which defendant relied in his in limine motion. Defendant's identification expert did not testify at the hearing and we are not asked to consider his testimony in connection with defendant's suggestive identification procedure claim.

he gave T.P. his customary admonishment, in which he tells a victim or witness that there are subjects detained, that the subjects may or may not be involved, and that, if the victim or witness is not sure, he or she should say so. "If you don't know -- or if you say no, say no. If it's 100 percent, yes. If you say maybe, maybe." He also tells victims and witnesses to have an open mind. In the recorded portion of the admonishment, Roddy is heard telling T.P., "[i]f you're not sure, you're not sure. But don't say yes just because --."

As they rode towards the location of the showup, Roddy stated, "I think they got two out of the three." Later, T.P. asked, "Those guys will do a lot of time for what they did huh?" Roddy responded, "I think so." As they approached the location of the showup, T.P. stated, "That's my trailer right there. There's my truck."

T.P. viewed defendant and stated, "Yeah that was one of them." Asked by Roddy how he knew, T.P. stated, "Because of his face." When Roddy remarked, "I didn't think you saw any of their faces," T.P. responded, "No but his eyes though, I could see his eyes." T.P. stated that he was "not 100% but see what my daughter says." Roddy confirmed that T.P. was saying "the eyes look the same," and T.P. responded, "His face kind of like yeah, his face." Roddy asked, "So not 100% positive but the eyes and face look familiar," and T.P. responded, "Yeah. Where's the other one?" Thereafter, he immediately identified Wainiqolo, the largest of the three, as he was getting out of the patrol vehicle.

We agree with the trial court's assessment that the showup involving defendant was, to an extent, suggestive. The suggestive portion of the procedure occurred when Roddy told T.P., "I think they got two out of the three." Further, when, T.P. asked, "Those guys will do a lot of time for what they did huh?" Roddy responded, "I think so." These statements could suggest to T.P. that police believed that they had apprehended the perpetrators of the home invasion. This potential for suggestiveness was exacerbated by the fact that T.P. viewed defendant shortly after seeing his stolen truck and trailer, and in

19

close proximity thereto. "A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police." (*People v. Slutts* (1968) 259 Cal.App.2d 886, 891.)

While there are elements of suggestiveness here, any suggestiveness in the showup procedure relative to defendant was mitigated by Roddy's earlier admonishment. Any suggestiveness was further mitigated by Roddy repeatedly challenging T.P. about his identification. When T.P. identified defendant, Roddy asked T.P. how he knew. When Roddy remarked, "I didn't think you saw any of their faces," T.P. responded, "No but his eyes though, I could see his eyes." Indeed, Roddy asked T.P. if he was positive, and T.P. responded that he was "not 100%," thus suggesting that T.P. was not unduly influenced by the suggestive circumstances we have identified.

Defendant relies upon *People v. Sandoval* (1977) 70 Cal.App.3d 73 (*Sandoval*). In that case, "[a]pproximately 30 to 45 minutes after the robbery, the victim who was sitting in a room at the police station was told by the police that the suspect would be brought 'through the hallway.' As defendant passed, the victim identified him . . . , recognizing him 'by his face.' " (*Sandoval*, at p. 80.) More specifically, "[t]he victim was told by the police before she saw the defendant that they would bring the suspect through that hallway because they were bringing others through another way. She affirmed that when she saw him she 'understood' that he was the man the police 'thought' had 'snatched' her purse. Thus . . . , 'the procedure followed in effect suggested' to the victim that defendant was the robber." (*Id*. at p. 85.) The *Sandoval* court further determined that there was no evidence to support the conclusion that there was an independent origin for the victim's in-court identification of the defendant. (*Ibid*.) While the court found the admission of the victim's tainted in-court identification to be error, the court further determined that the error was harmless beyond a reasonable doubt. (*Id*. at p. 86.)

20

We do not consider the procedure here to be nearly as suggestive as that in *Sandoval*. Moreover, the significant factors mitigating suggestiveness we noted *ante*, or any like them, appear to have been absent in *Sandoval*. We conclude the showup procedure here relative to defendant was not " ' "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." ' " (*Sanchez, supra*, 7 Cal.5th at p. 35.)

Defendant denigrates showup procedures as suggestive as a general matter. However, as defendant acknowledges, our high court has stated that " '[t]he "single person showup" is not inherently unfair.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 413; accord *People v. Bisogni* (1971) 4 Cal.3d 582, 587 (*Bisogni*).) " '[S]ingle-person show-ups for purposes of in-field identifications are encouraged, because the element of suggestiveness inherent in the procedure is offset by the reliability of an identification made while the events are fresh in the witness's mind, and because the interests of both the accused and law enforcement are best served by an immediate determination as to whether the correct person has been apprehended.' " (*People v. Garcia* (2016) 244 Cal.App.4th 1349, 1359, quoting *In re Carlos M.* (1990) 220 Cal.App.3d 372, 387.) "Prompt identification of a suspect who has been apprehended close to the time and place of the offense 'aids in quickly exonerating the innocent and discovering the guilty.' " (*People v. Irvin* (1968) 264 Cal.App.2d 747, 759; accord *People v. Nguyen* (1994) 23 Cal.App.4th 32, 38-39.) "One of the justifications for a showup is the need to exclude from consideration innocent persons so that the police may continue the search for the suspect while it is reasonably likely he [or she] is still in the area." (*People v. Johnson* (1989) 210 Cal.App.3d 316, 323.) The People also note that certain qualities defendant raises relative to the asserted suggestiveness of the procedure—defendant was handcuffed and standing next to two officers at the time—are typical of showups generally. (E.g., *People v. Rocha* (2013) 221 Cal.App.4th 1385, 1389 [burglary victim brought to location

by police officer for showup where she saw the defendant standing by a police car in handcuffs].)

The People assert defendant's contention that the showup was not warranted by exigent circumstances relies on a faulty premise, as there is no requirement that a showup be supported by exigent circumstances or that a six-pack photo lineup is required unless exigent circumstances exist. Such circumstances are indeed but one factor to be considered under the totality of the circumstances. (See, e.g., *Bisogni, supra*, 4 Cal.3d at pp. 586-587 [discussing the totality of the circumstances, which, among other things, included the absence of any emergency requiring a single-person showup].)

### 2. Reliability & Harmless Error

Because we conclude that the showup procedure employed here was not unduly suggestive and was not " ' "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," ' " we need not reach the question of reliability. (*Sanchez, supra,* 7 Cal.5th at p. 35 [court considers reliability factors if it concludes the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification].) And in any event, we conclude any error related to the showup identification procedure here is harmless.

Defendant asserts that the error in admitting evidence of T.P.'s identification cannot be deemed harmless beyond a reasonable doubt under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] (*Chapman*). He points out that there was virtually no physical or DNA evidence linking him to the intrusion. He also emphasizes that E.P. was not able to identify him as one of the perpetrators. According to defendant, his presence in T.P.'s truck at the time police stopped it does not undermine his argument, maintaining that "[n]othing necessarily excludes the possibility that [defendant] had nothing to do with the intrusion and merely got into the truck sometime thereafter." The People respond that the harmless error standard for state law error set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, applies. Noting that

22

defendant does not raise a challenge pertaining to T.P.'s in-court identification, the People further assert that any error in the admission of T.P.'s showup identification of defendant was harmless under any standard. We conclude that even if it was error to admit T.P.'s pretrial identification of defendant, and assuming the more stringent *Chapman* standard applies, we conclude that the error was harmless beyond a reasonable doubt.

Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*People v. Geier* (2007) 41 Cal.4th 555, 608.) In assessing prejudice under the *Chapman* standard, we must "examin[e] the entire cause, including the evidence, and consider[] all relevant circumstances," to determine whether the error was harmless beyond a reasonable doubt. (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.) In other words, "we ask 'whether it is clear beyond a reasonable doubt that a reasonable jury would have rendered the same verdict absent the error.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 615 (*Canizales*), quoting *People v. Merritt* (2017) 2 Cal.5th 819, 831; accord *Neder v. United States* (1999) 527 U.S. 1, 18 [144 L.Ed.2d 35].)

At trial, T.P. identified defendant as one of the perpetrators. T.P. was 100 percent certain of his in-court identification of defendant as one of the perpetrators. Defendant and his confederates were in T.P.'s presence for approximately ten minutes. At any given time, one or more of the perpetrators were in close proximity to T.P. Indeed, they were close enough to inflict beatings on him. T.P. was able to give a general description of the height and weight of perpetrators to the first officer on the scene and defendant does not dispute the accuracy this description. The showup was less than two hours after the robbery. T.P. immediately identified Wainiqolo as he was getting out of the police car. The evidence discloses that T.P. was not tainted by suggestiveness in identifying Zamora at the showup; even though the police showed T.P. the mask in the Infinity

23

before showing T.P. Zamora, T.P. did not identify him.  However, T.P. told Officer Roddy that one of the perpetrators was wearing white shoes with blue stripes, and Zamora was wearing white shoes with striping when he was apprehended.

In addition to identifying defendant at trial, T.P. also identified Wainiqolo and Zamora as the other two perpetrators.  The defense thoroughly challenged the identifications at trial.  The trial court instructed the jury with CALCRIM No. 226 and CALCRIM No. 315.[13]  Thus, the jury was properly instructed on the manner to consider T.P.'s identifications.

_____

[13]  The trial court instructed the jury with CALCRIM No. 226 as follows:  "You alone must judge the credibility or believability of witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.  You may believe all, part or none of any witness's testimony.  Consider the testimony of each witness, and decide how much of it you believe.  [¶]  In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.  Among the factors that you may consider are, [¶]  How well could the witness see, hear or otherwise perceive the things about which the witness testified?  [¶]  How well was the witness able to remember and describe what happened?  [¶]  What was the witness's behavior while testifying?  [¶]  Did the witness understand the questions and answer them directly?  [¶]  Was the witness's testimony influenced by a factor, such as, bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?  [¶]  What was the witness's attitude about the case or about testifying?  [¶]  Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?  [¶  How reasonable is the testimony when you consider all the other evidence in this case?  [¶]  Did the other evidence prove or disprove any fact about which the witness testified?  [¶]  Was the witness promised immunity in exchange for his or her testimony?  [¶]  Do not automatically reject testimony just because of inconsistencies or conflicts.  Consider whether the differences are important or not.  People sometimes honestly forget things or make mistakes about what they remember.  Also, two people may witness the same event, yet hear it or see it differently.  [¶]  If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject. . . . If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says, or if you think the witness lied about some things but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

In addition to this direct evidence, defendant's flight and other strong circumstantial evidence establishes defendant's guilt as one of the three perpetrators.

The CHP helicopter unit spotted T.P.'s stolen truck and trailer at approximately 3:00 a.m., minutes after police units were dispatched to T.P.'s house at 2:49 a.m., following T.P.'s 911 call.[14] The truck pulled over and two individuals fled from the truck. The CHP helicopter unit observed the two subjects within the perimeter. Defendant does not dispute that he was one of the people who fled T.P.'s truck. An officer on the ground saw defendant shirtless, with a T-shirt in his hand. When the officer told defendant to stop, defendant looked at the officer and fled. He jumped over a fence and hid behind a bush. When the canine was deployed, defendant attempted to go

---

The trial court instructed the jury with CALCRIM No. 315 as follows: "You have heard eyewitness testimony identifying the defendant. As with other witnesses, you must decide whether a witness gave accurate and truthful testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as, lighting, weather conditions, obstructions, distance and duration of observation? [¶] How closely was the witness paying attention? [¶] . . . Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does the description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made the identification? [¶] Are the witnesses and the defendant of different races? [¶] Was the witness able to identify other participants in the crime? [¶] Was the witness able to identify the defendant in a photographic or physical lineup? [¶] Were there other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendants who committed the crime. If the People have not met this burden, you must find the defendants not guilty."

[14] E.P. testified that police dispatched to the house arrived "[p]robably five" minutes after T.P. called 911.

25

over a fence, but he was apprehended by the canine. Despite the canine biting defendant's leg, defendant did not make any noise. There is no evidence in the record providing an innocent explanation for defendant's presence in the area or his flight from the officers, and defendant's flight and silence when bitten by Brig were evidence of consciousness of guilt, about which the jury was properly instructed.[15]

One of defendant's confederates, Wainiqolo, was driving the truck. He too was apprehended nearby after fleeing from the truck. T.P. testified that, at the time of the home invasion, he had $800 hidden between his mattress and box spring, specifically one $100 bill and the rest in $20 bills. The perpetrators took his son's gun, a TEC-9, and the money. The marijuana plants growing in T.P's backyard were also missing. When Wainiqolo was apprehended, police found $800 in his possession, one $100 bill and 35 $20 bills. In the bed of T.P.'s truck, police found approximately 13 pounds of marijuana plants. In the back of the Infiniti, police found a TEC-9. The jury was properly instructed that it could infer the men were the robbers based on the unexplained possession of recently stolen property.[16]

_____

[15] The jury was instructed with CALCRIM No. 372 on defendant's flight as follows: "If the defendants fled or tried to flee immediately after the crime was committed, that conduct may show that they were aware of their guilt. If you conclude that the defendants fled or tried to flee, it is up to you to decide the meaning and importance of that conduct; however, evidence that the defendants fled or tried to flee cannot prove guilt by itself."

[16] The court instructed the jury with CALCRIM No. 376 as follows: "If you conclude that the defendant knew he possessed property and you conclude that the property had in fact been recently stolen, you may not convict the defendant of robbery and carjacking based on those facts alone. However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed robbery and carjacking. [¶] The supporting evidence need only be slight and need not be enough by itself to prove guilt. You may consider how, where, and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt of robbery and carjacking. [¶] Remember that you may not convict the

26

T.P. testified that the perpetrators all wore gloves of the kind one might see at a doctor's office. Blue latex gloves were found in one of defendant's pockets at the time he was apprehended. This is not something one would expect to find in the pocket of someone who only joined up with the robbers after the home invasion as defendant postulates he may have done. In the backyard of a house in the area where defendant was apprehended, police found more blue rubber or medical gloves, and, in another yard, a pair of blue latex gloves.

In the Infiniti Zamora had been driving, police discovered a white ski mask in addition to the TEC-9. Two cuttings taken from the ski mask contained DNA mixtures with Zamora as a possible contributor. On Zamora's person police found a single $100 bill. E.P. testified that a $100 bill was missing from her room. During his interaction with law enforcement, Zamora said, "Did you guys get everybody?" The evidence reveals the answer to that question is "yes."

In light of this overwhelming evidence of defendant's guilt, we conclude that, even if it was error to admit T.P.'s pretrial identification of defendant, such error was harmless beyond a reasonable doubt.[17] It is " 'clear beyond a reasonable doubt that a

---

defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

[17] Defendant notes that the jury found the gun enhancement allegations to be not true, referring to this as a "mixed verdict" which demonstrates that "the jury did not embrace the prosecution's theory of culpability with wholeheartedness." Defendant asserts that, under such circumstances, reviewing courts generally lack the necessary confidence to conclude that an error was harmless. Based on the trial evidence set forth *ante*, we do not lack the confidence to determine that any error regarding T.P.'s pretrial identification of defendant was harmless beyond a reasonable doubt. The not true findings on the personal use of a firearm enhancement allegations do not undermine our conclusion, given T.P.'s inconsistent testimony about who had the rifle. Indeed, at one point in his testimony, T.P. acknowledged he did not remember exactly which man held which gun during the incident, and his daughter testified one of the men had a hammer, not a gun.

27

rational jury would have rendered the same verdict' " in the absence of the admission of T.P.'s pretrial identification of defendant. (*Canizales, supra*, 7 Cal.5th at p. 615.)

## II. Substantial Evidence Supports the Carjacking Conviction

### A. Defendant's Contentions

Defendant asserts that the judgment as to count three must be reversed because substantial evidence does not support his conviction of carjacking. (§ 215.) Defendant specifically challenges the "taken from the possessor's immediate presence" element. (Capitalization and bold omitted.) Defendant asserts that there is no evidence in the record to establish that T.P. was in the kitchen, from which the keys were taken, at any time during the intrusion, or that the keys were in his immediate reach during any relevant time. Defendant further asserts that there is no evidence that he directly, or as an aider and abettor, took T.P.'s truck from his immediate presence against his will.

### B. Substantial Evidence

"The law governing sufficiency-of-the-evidence challenges is well established . . . . [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.) In other words, " '[a] reversal for insufficient

28

evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142, italics added.)

### C.  Carjacking Elements and "Immediate Presence"

"A conviction for carjacking requires proof that (1) the defendant took a vehicle that was not his . . . (2) from the immediate presence of a person who possessed the vehicle or was a passenger in the vehicle (3) against that person's will (4) by using force or fear and (5) with the intent of temporarily or permanently depriving the person of possession of the vehicle."[18]  (*People v. Magallanes* (2009) 173 Cal.App.4th 529, 534, citing § 215, subd. (a) & *People v. Hill* (2000) 23 Cal.4th 853, 858-859.)  "[S]omething is in a person's 'immediate presence' if it is ' " 'so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.' " '  [Citations.]  'Under this definition, property may be found to be in the victim's immediate presence "even though it is located in another room of the house, or in another building on [the] premises." '  [Citation.]  Or, as the Court of Appeal [has] said, 'A vehicle is within a person's immediate presence for purposes of carjacking if it is sufficiently within his control so that he could retain possession of it if not prevented by force or fear.' "  (*People v. Johnson* (2015) 60 Cal.4th 966, 989 (*Johnson*).)

In *People v. Hoard* (2002) 103 Cal.App.4th 599 (*Hoard*), the defendant took the victim's keys from her while her car was parked in a parking lot outside the store where she worked.  (*Id*. at p. 608.)  That court concluded:  "the elements of carjacking were established.  Defendant took possession of [the victim's] car by threatening her and demanding her car keys.  Although she was not physically present in the parking lot when

---

**18**  Defendant solely asserts that the evidence was insufficient to support his conviction of carjacking based on the "immediate presence" element.  Therefore, we do not address the other elements.

he drove the car away, she had been forced to relinquish her car keys. Otherwise, she could have kept possession and control of the keys and her car. Although not the 'classic' carjacking scenario, it was a carjacking all the same." (*Id*. at p. 609, fn. omitted, citing *People v. Medina* (1995) 39 Cal.App.4th 643, 648 (*Medina*).)

In *People v. Gomez* (2011) 192 Cal.App.4th 609 (*Gomez*), disapproved on another ground in *People v. Elizalde* (2015) 61 Cal.4th 523, 538, footnote 9, the defendant "and three others assaulted [the victim] at an apartment complex where [the victim] lived. During the attack, one of the assailants obtained the keys to [the victim's] pickup truck. After beating [the victim], the four men left the apartment complex in defendant's car, then returned 10 or 20 minutes later. By that time, [the victim] was inside his apartment. Two of the four assailants got into [the victim's] truck and drove away." (*Gomez*, at p. 613.) A jury found the defendant guilty of, among other things, carjacking. (*Ibid*.) On appeal, the defendant asserted that "the evidence was insufficient to establish that [the victim's] truck was taken from his immediate presence. He argues the truck was not taken from [the victim's] immediate presence because, by the time he and his compatriots returned to take the truck, '[the victim] had left and was in his apartment.' " (*Id*. at p. 623.) The court stated that "[i]t is not necessary that the victim be physically present in the vehicle when the confrontation occurs." (*Ibid*., citing *Medina, supra*, 39 Cal.App.4th at p. 650.) The court concluded: "although [the victim] was inside his apartment at the time the [men] took his truck, the truck was only approximately 10 feet away from him. He watched the men through his window and made eye contact with them. Under the circumstances described above, the jury could reasonably find that [the victim] was fearful of a further assault and would have acted to stop the [men] and retain possession of his truck if not prevented by such fear." (*Gomez*, at p. 624.)

In *Medina*, "the victim was lured into a motel room by an accomplice of the defendant. [Citation.] There, the defendant and accomplices bound the victim, took his car keys, then took his car. [Citation.] The defendant challenged his conviction for

30

carjacking, arguing that 'actual physical proximity of the victim to the vehicle is required.' [Citation.] The Court of Appeal disagreed, explaining that the 'only reason [the victim] was not in the car when it was taken and this was not a "classic" carjacking, was because he had been lured away from it by trick or device.' " (*Gomez, supra*, 192 Cal.App.4th at pp. 623-624, discussing *Medina, supra*, 39 Cal.App.4th at pp. 646-647, 649, 651-652.)

## D. Analysis

During the home invasion, when T.P. was still held captive in his garage, one of the men asked him what he had in the trailer attached to his truck, and he responded that he had his landscaping equipment in it. T.P. told the man that the keys were "right there in the kitchen." T.P. testified that both sets of keys to both of his trucks were in the kitchen. When T.P. went outside after the men left, he saw that one of his trucks and the trailer that was attached to it were gone. The truck and trailer had been parked in the driveway, with the trailer "backed up right to the garage door."

Regarding the layout of his house, T.P. testified that the home is only 950 square feet. It had three bedrooms and one bathroom. The front door opened onto the living room. There was the "living room and then the hallway and then to the right is the kitchen and the dining room." In between the kitchen and the dining room there was a door leading out to the garage. Thus, entering the house, "you have to go to the right of the house, and there's a door that takes you into the garage." E.P. testified that walking into the front door of her house, the living room is to the left and to the right are the kitchen and dining room. "The garage is after the kitchen, so it's to the right, and then after you leave the kitchen you go into the garage."

We conclude that substantial evidence supported defendant's conviction of carjacking. T.P., while in the garage, told the perpetrators that the truck keys were in the kitchen, which was directly next to the door leading to the garage. Defendant and his confederates took the keys, and, when T.P. was closed in the bathroom with E.P., the men

31

took the truck and trailer from the driveway just on the other side of the garage door. But for defendant and his companions inflicting beatings on T.P., and T.P.'s fear that the intruders would harm E.P. and would continue to harm him, T.P. "could have kept possession and control of the keys and" his truck. (*Hoard, supra*, 103 Cal.App.4th at p. 609.) As noted, " '[a] vehicle is within a person's immediate presence for purposes of carjacking if it is sufficiently within his control so that he could retain possession of it if not prevented by force or fear.' " (*Johnson, supra*, 60 Cal.4th at p. 989.) While the keys were not on T.P.'s person, under the particular circumstances of this case, they were sufficiently within his immediate presence so as to satisfy that element to support a carjacking conviction. " '[P]roperty may be found to be in the victim's immediate presence "even though it is located in another room of the house, or in another building on [the] premises." ' " (*Ibid*.)

Defendant relies on *Johnson*. In *Johnson*, "the victim's car was in her garage, only separated from the kitchen by a breezeway. Normally, in order to accomplish a carjacking, the perpetrator must take not only the car itself but the keys to the car. Witnesses who knew [the victim] well testified that she normally kept her car keys on a kitchen counter or in her purse or in a dish that was on the counter. Cookie dough and a mixer were on the kitchen counter after [the victim's] death, indicating she was in the kitchen baking cookies. Police found blood throughout the house, including blood smears on the kitchen counter, indicating that defendant took the keys (and other property) after he killed [the victim]. *Thus, the jury could reasonably find that the car keys were within the victim's immediate reach at the time defendant arrived at her door, and defendant took the keys from where she had been*. All of this evidence supports a jury finding that the victim could have retained possession of her keys and car had defendant not prevented her from doing so by force or fear—in this case, deadly force." (*Johnson, supra*, 60 Cal.4th at p. 990, italics added.) Defendant relies on the italicized language, arguing that, here, there is no evidence that T.P. was ever in the kitchen during

the incident or that the keys were within his "immediate reach." However, notwithstanding the italicized language from *Johnson*, there is not a requirement, based on statute or case law, that for the evidence to be sufficient to support a carjacking conviction, the vehicle keys must be taken from within the victim's "immediate reach." Indeed, language in *Johnson* undermines the notion that any such requirement exists. (See *id*. at p. 989 [" '[P]roperty may be found to be in the victim's immediate presence "even though it is located in another room of the house, or in another building on [the] premises" ' "].) Moreover, given the description of the layout of the residence, it is clear that when the victim was escorted to the garage and then to the bathroom to join his daughter, he went through or by the kitchen where his keys were.

Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that defendant and his companions took T.P.'s truck and trailer from his immediate presence against his will by using force or fear with the intent of temporarily or permanently depriving T.P. of possession of the vehicle.[19]

### III. Sentencing Issues

The sentencing with respect to counts two and three raise issues we must address because, as orally stated by the trial court, the sentences on those counts were unauthorized. Accordingly, we reach these issues notwithstanding the fact that they were not raised by the parties.

---

[19] In light of our conclusion, we need not address defendant's contention that, if we reverse on count three, fundamental fairness requires resentencing on the remaining counts. Indeed, as we discuss *post*, the court concluded that the carjacking count was subject to section 654 treatment and consequently, it appears this conviction did not factor into the sentence on the two counts of first degree robbery.

### A. Count Two - Section 1170.1, Subdivision (a)

In sentencing defendant to a consecutive sentence on count two, the second first degree robbery count, rather than stating that the subordinate term would be one-third the midterm as prescribed by section 1170.1, subdivision (a), the trial court purported to impose the midterm on count two but stay all but one-third of that sentence, or two years. Section 1170.1, subdivision (a), sets forth the law concerning consecutive sentencing on subordinate terms. With few exceptions not applicable here, "[t]he subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed." (§ 1170.1, subd. (a); *People v. Felix* (2000) 22 Cal.4th 651, 655 ["in general (there are exceptions), the court imposes only 'one-third of the middle term' for subordinate terms"].) There is no provision in law authorizing the court to impose a full-term sentence and then stay all but one-third the midterm. The proper way of imposing the subordinate term sentence is to impose "one-third of the middle term" and articulate the number of months or years that equates to one-third of the middle term. (See Couzens, Bigelow & Pricket, Sentencing Cal. Crimes (The Rutter Group 2016), Multiple Counts, § 13:19 (Couzens, Bigelow & Pricket) [noting that "[i]t is not appropriate, for example, to impose the full middle term and suspend all but one-third"].) The court should have simply imposed one-third of the midterm as prescribed by section 1170.1.

We shall modify the oral pronouncement of judgment to reflect the correct sentence. However, because the abstract of judgment reflects the imposition of the correct sentence, the abstract need not be amended in this regard.

### B. Count Three - Section 654

On count three, the trial court did not orally impose any particular term from the statutory triad. (§ 215, subd. (b).) Instead, the trial court stated: "Count Three, violation of . . . Section 215, carjacking, that sentence will be stayed pursuant to . . . Section 654."

The abstract of judgment reflects that the trial court stayed the sentence on count three, but it does not reflect what that sentence was.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Here, the trial court "stay[ed] imposition of sentence . . ." on count three pursuant to section 654. However, "when a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence [and] to stay the *execution* of the duplicative sentence . . . ." (*People v. Duff* (2010) 50 Cal.4th 787, 796; see *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469 (*Alford*); *People v. Niles* (1964) 227 Cal.App.2d 749, 755-756.) It is improper to stay imposition of the sentence. (Couzens, Bigelow & Prickett, at § 13:10.) Thus, even though section 654 requires that the sentence imposed on count three be stayed, the trial court was nevertheless required to impose judgment on that count, which involves selecting a term, and then staying execution of the sentence, the stay to become permanent upon defendant's service of the portion of the sentence not stayed. (*People v. Salazar* (1987) 194 Cal.App.3d 634, 640; see *Duff,* at p. 796; Couzens, Bigelow & Prickett, at § 13:10.) "This procedure ensures that the defendant will not receive 'a windfall of freedom from penal sanction' if the conviction on which the sentence has not been stayed is overturned." (*Salazar*, at p. 640.) The trial court thus "committed unauthorized sentencing error by failing first to pronounce sentence on count 9 and then stay execution of the sentence." (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1327; see *Alford*, at p. 1472.)

The upper term for carjacking is nine years, the same as the upper term the trial court imposed on count one, first degree robbery. In imposing the upper term for the first count of first degree robbery, the trial court found the crime involved great violence, bodily injury or threat of bodily injury. The court further found the crime was carried out

35

with planning and sophistication, noting that the perpetrators were masked, gloved and "didn't pick that house at random." The court then noted defendant engaged in violent conduct which indicates a serious danger to society. As to this finding, the court stated: "[T]he audacity to kick in the door of an occupied house in the middle of the night is heartless and dangerous, especially when there's a teenage girl in there. Somebody could have been seriously injured or killed."

Where we can determine from the record the sentence the trial court would "[u]ndoubtedly" impose, we need not remand for resentencing. (*Alford, supra*, 180 Cal.App.4th at p. 1473.) Instead we may exercise our authority to modify the judgment. (*Ibid*.) On this record, given that the court imposed the upper term on count one, first degree robbery, and its statements for doing so, we conclude that, if we were to remand, the trial court would "undoubtedly" impose the same upper term sentence on count three, carjacking, and then stay execution of that sentence pursuant to section 654. (*Ibid.*) We shall modify the sentence on count three accordingly.

*****

36

## DISPOSITION

The oral pronouncement of judgment is modified to reflect imposition of one-third the midterm of six years, which is two years, as the subordinate term on count two. We further modify the sentence to impose the upper term of nine years on count three and stay execution of sentence on that count pursuant to section 654. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy thereof to the Department of Corrections and Rehabilitation.

/s/
MURRAY, Acting P. J.

We concur:


/s/
HOCH, J.


/s/
KRAUSE, J.

37